# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES' AND SANITATION EMPLOYEES' RETIREMENT TRUST, on behalf of itself and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9980-CB |
| JERRY M. COMSTOCK, JR., as Independent Executor of the Estate of Joshua E. Comstock, RANDALL C. MCMULLEN, DARREN M. FRIEDMAN, ADRIANNA MA, MICHAEL ROEMER, C. JAMES STEWART, III, H.H. "TRIPP" WOMMACK, III, THEODORE "TED" MOORE, NABORS INDUSTRIES LTD., NABORS RED LION LIMITED, and MORGAN STANLEY & CO. LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: May 24, 2016
Date Decided: August 24, 2016

Stuart M. Grant, Mary S. Thomas and Jonathan M. Kass, GRANT & EISENHOFER P.A., Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen and Christopher J. Orrico, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Plaintiff City of Miami General Employees' and Sanitation Employees' Retirement Trust.*

Stephen C. Norman, Michael A. Pittenger and Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael C. Holmes, Manuel G. Berrelez, Elizabeth C. Brandon, Craig E. Zieminski, Olivia D. Howe, Meriwether T. Evans and Meredith S. Jeanes, VINSON & ELKINS LLP, Dallas, Texas; *Attorneys for Defendants Jerry M. Comstock, Jr. Randall C. McMullen, Darren M. Friedman, Adrianna Ma, Michael Roemer, C. James Stewart, III, H.H. "Tripp" Wommack, III, and Theodore "Ted" Moore*; William M. Lafferty and Lindsay M. Kwoka, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Alan J. Stone and Hailey DeKraker, MILBANK, TWEED, HADLEY & MCLOY, LLP, New York, New York; *Attorneys for Defendants Nabors Industries, Ltd. and Nabors Red Lion Limited*; Ashley R. Altschuler and John L. Reed, DLA PIPER LLP (US), Wilmington, Delaware; John J. Clarke, Jr., DLA PIPER LLP (US), New York, New York; *Attorneys for Defendant Morgan Stanley & Co. LLC*.

**BOUCHARD, C.**

This case involves a stockholder challenge to the merger of C&J Energy Services, Inc. and a subsidiary of Nabors Industries Ltd. that held its completion and production services business. On November 25, 2014, this Court issued a preliminary injunction enjoining the transaction from closing until after C&J solicited alternative proposals to purchase C&J during a 30-day period. On December 19, the Supreme Court reversed that order. In March 2015, after receiving the approval of approximately 97.6% of the shares of C&J stock that voted, the transaction closed.

Seven months after the closing, plaintiff amended its complaint to assert claims seeking damages for breaches of fiduciary duty against the members of the C&J board and certain of its officers challenging their conduct in deciding to enter the Nabors transaction in the first place and in carrying out the Court-ordered solicitation process, and challenging for the first time various disclosures in the proxy that was disseminated to C&J's stockholders before they voted to approve the transaction. Plaintiff also sued Nabors and the financial advisor to the special committee that ran the solicitation process, Morgan Stanley & Co., for aiding and abetting the alleged breaches of fiduciary duty.

Pending before the Court are two motions: (1) defendants' motion to dismiss the amended complaint for failure to state a claim for relief, and (2) C&J's motion to recover approximately $542,000 in damages against the bond that the

1

plaintiff posted to secure entry of the preliminary injunction order. For the reasons explained below, both motions are granted.

With respect to the first motion, I conclude that plaintiff's claims for post-closing damages against C&J's directors and officers are subject to the business judgment presumption under the Delaware Supreme Court's decision in *Corwin v. KKR Financial Holdings LLC* because of the legal effect of the stockholder vote, and that judicial review of plaintiff's fiduciary duty claims (and related aiding and abetting claims) thus ends there. This conclusion follows from two subsidiary determinations: that plaintiff has failed to plead facts sufficient to demonstrate that the C&J stockholder vote was not fully informed, and that plaintiff has not alleged facts showing that the challenged transaction, which was approved by a majority of disinterested and independent directors, should be subject to entire fairness review.

With respect to the second motion, I conclude that C&J is entitled to a rebuttable presumption that it may recover its damages against the injunction bond, which consist primarily of the costs of legal and financial advisors that provided assistance during the Court-ordered solicitation process, and that plaintiff has failed to demonstrate circumstances warranting a deviation from this presumption. Thus, C&J is entitled to its requested damages.

## I.      BACKGROUND

Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Amended Verified Class Action Complaint (the "Complaint").

### A.      The Parties and Relevant Entities

Before the transaction at issue in this action, C&J Energy Services, Inc. ("C&J"), a Delaware corporation, provided fracturing, pressure pumping, and oilfield services. Defendant Nabors Industries, Inc. ("Nabors"), a Bermuda company, is an owner and operator of drilling rigs and provides related services. On March 20, 2015, C&J merged with a subsidiary of Nabors that held Nabors' completion and production services business. This transaction is referred to herein as the "Nabors transaction." The surviving entity of the Nabors transaction was C&J Energy Services, Ltd. ("New C&J"), a Bermuda company that was formerly known as Nabors Red Lion Limited.[1]

Plaintiff City of Miami General Employees' and Sanitation Employees' Retirement Trust is a single-employer defined benefit retirement plan for certain employees and retirees of the City of Miami. It alleges it held shares of C&J common stock at all relevant times.

---

[1] On July 20, 2016, New C&J filed for bankruptcy. Dkt. 302. On August 5, 2016, counsel for the individual defendants informed the Court that they do not contend at this time that they are affected by the bankruptcy stay. Dkt. 307.

3

Defendant Joshua E. Comstock was the CEO and Chairman of C&J Energy Services, Inc. ("C&J").[2] After the Nabors transaction, Comstock became CEO and Chairman of New C&J. Defendant Randall C. McMullen was the President and Chief Financial Officer of C&J and a member of C&J's board. McMullen became the CFO and a director of New C&J after the Nabors transaction.

Defendants Darren M. Friedman, Adrianna Ma, Michael Roemer, C. James Stewart, and H.H. "Tripp" Wommack, III, were non-management directors of C&J during the negotiation, signing, and closing of the Nabors transaction. I refer to these five individuals as the "Outside Directors." Friedman, Ma, and Stewart were members of a special committee that C&J formed to conduct the Court-ordered solicitation process (the "Special Committee").

Defendant Theodore "Ted" Moore served as C&J's Executive Vice President and General Counsel. Moore became New C&J's Executive Vice President, General Counsel and Chief Risk Officer after the Nabors transaction.

Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware LLC based principally in New York.

---

[2] Comstock passed away on March 11, 2016. Dkt. 290 (Rule 25(a) Notice Regarding Joshua E. Comstock). On June 2, 2016, the Court entered an order substituting Jerry M. Comstock, Jr., Independent Executor of the Estate of Joshua E. Comstock, as a party defendant in Joshua E. Comstock's place. Dkt. 301.

4

**B.    The C&J-NCPS Transaction**

Comstock founded C&J in 1997 and took it public in 2011.  In October 2013, C&J became interested in pursuing possible acquisitions and retained Goldman Sachs to advise on a potential deal with Chesapeake Oil Services.

In January 2014, Citigroup Global Markets Inc. ("Citi") approached Comstock with a proposal to combine C&J and Nabors' completion and production services business ("NCPS") by having C&J merge into a subsidiary of Nabors, with C&J's stockholders retaining 45% of the combined entity's stock and Nabors retaining 55%.  On January 16, Comstock and McMullen met with a representative of Citi and Tony Petrello, the Chairman of Nabors, to discuss the potential deal.  Everyone understood that Comstock's support for any such transaction was conditional on his remaining Chairman of the combined entity.  Comstock did not tell the C&J board about his discussions at this time.

On March 5, 2014, Comstock and McMullen met Nabors executives to continue analyzing the potential transaction.  In this meeting, Nabors informed Comstock that NCPS's EBITDA for 2014 and 2015 would be significantly worse than previously projected.  Later in March, Nabors reduced NCPS's 2014 EBITDA projection by an additional $51 million.

On April 3, 2014, Comstock informed the C&J board about the potential Nabors deal.  He presented the transaction as an acquisition of NCPS by C&J and

did not disclose that the deal would result in the sale of a majority stake of C&J. Comstock told the board that its current board members would comprise a majority of the New C&J board and that Nabors would re-elect the current C&J directors for at least five additional years. The C&J board authorized Comstock and Citi to send a non-binding letter for the acquisition of NCPS for an initial maximum aggregate value of up to $2.6 billion.

On April 4, Comstock made an offer at the enterprise value cap of $2.6 billion, which implied an EBITDA multiple for NCPS of 6.5. Under this offer, Nabors would receive a majority stake in the combined company and $916 million in cash, and C&J's stockholders would receive a minority stake in the combined company. The offer letter indicated that any definitive transaction agreements, employment agreements, and organizational documents would need to include protections to ensure continuity with C&J's management team and board of directors.

On April 10, Petrello urged Comstock to increase the premium C&J would pay for Nabors based on tax benefits resulting from inverting C&J into a Bermuda company. These benefits would be captured by way of a $1 billion intra-company note. Comstock included this note in his transaction proposal and valued the resulting tax benefits at $250 million.

6

On April 14, Comstock asked the C&J board to approve an increase of C&J's offer from an aggregate enterprise value of $2.6 billion to $2.75 billion, which implied a 6.9 multiple of NCPS's 2014 EBITDA. The C&J board agreed, and Comstock sent this higher offer to Petrello on April 16.

On April 22, Nabors released its first-quarter results, reporting negative $3 million in operating income and $53 million in EBITDA. Comstock was disappointed with these results and realized that NCPS would be unlikely to reach the already-reduced $400 million 2014 EBITDA forecast. The next day, Petrello rejected C&J's $2.75 billion proposal, complaining that the offer failed to account for synergies and demanding a cash payment upon closing rather than a debt instrument.

On April 25, without obtaining permission from the C&J board to further increase its offer, Comstock submitted a new proposal, this time valuing the combined enterprise at up to $2.9 billion and contemplating a cash payment to Nabors. Comstock based his new valuation on an annualized EBITDA multiple derived from NCPS's second quarter returns rather than on its full-year 2014 EBITDA. Comstock and Petrello eventually agreed to work toward a valuation of $2.925 billion. At that point, Comstock approached Citi through McMullen with an offer to lead the debt financing for the transaction in order to pay the $940 million cash component of Nabors' consideration.

7

On May 2, 2014, Comstock asked Petrello to add 2015 EBITDA to NCPS's financial information. Petrello then provided updated financials that included a 2015 EBITDA projection of $490 million, a 6x multiple to the previously discussed $2.925 billion valuation. Petrello provided this projection two days after KPMG sent Nabors a report that listed Nabors' management's projection of NCPS's 2015 EBITDA as being only $387.4 million.

C&J retained Deloitte Tax LLP to perform due diligence on NCPS in anticipation of a transaction. In mid-June, Deloitte noted that NCPS's April results were worse than expected. The May numbers, in contrast, were not credible to Comstock because they contained "creative accounting" that Comstock commented was used to show improved results.[3] Comstock and McMullen asked Deloitte to stop its due diligence, which it did from June 16 until June 19.

On June 18, 2014, Citi gathered its due diligence results, which also suggested lower April results, and which contained a "Management Case" 2015 EBITDA projection of $408 million. Comstock and Citi were comfortable with this projection, but at a 6x multiple, the enterprise value did not reach the $2.925 billion to which they had agreed. Comstock thus indicated that he was willing to increase the EBITDA multiple from 6.0 to 6.5. After recalculating NCPS's projected 2015 EBITDA, the "upside case" for NCPS's 2015 EBITDA came to

---

[3] Compl. ¶ 81.

8

$445 million according to McMullen, which was less aggressive than the $505 million Nabors estimated.[4] Citi and Tudor Pickering Holt & Co. ("Tudor"), which had been retained to provide a second fairness opinion, used this $445 million projection for their 2015 EBITDA estimate in their fairness opinions. They were not informed that McMullen allegedly viewed it as an upside case.

Shortly before a board meeting held on June 24, Comstock sent Petrello proposed employment contracts for himself and other C&J executives. Comstock's proposed agreement included a $19.1 million success bonus and severance payments of $173 million in the ordinary course and $220 million in connection with an unapproved change of control transaction. The board was not involved in negotiating these employment agreements, and Comstock noted that they would be subject to a vote of New C&J's stockholders.

On June 24, C&J's board approved a transaction to merge C&J with NCPS, with Nabors receiving $940 million in cash and a majority stake in the combined entity. The transaction called for four of C&J's seven board members to have guaranteed seats on the new entity's board for five years. The minutes of the board

[4] Compl. ¶¶ 89-90. As discussed below, plaintiff's description of this communication is contrary to the Supreme Court's review of the preliminary injunction record. Specifically, based on affidavits submitted by McMullen and Comstock and documentary exhibits of the e-mails in question, the Supreme Court found that the $445 million estimated EBITDA figure represented "management's expected or base case" and that Comstock inserted the reference to an "upside case" as "a negotiating tactic." *C&J Energy Servs., Inc. v. City of Miami Gen. Emps.' Ret. Tr.*, 107 A.3d 1049, 1061 n.54 (Del. 2014).

9

meeting indicate that the approval was for C&J's "acquisition of [NCPS]" rather than the sale of C&J.[5]  Accordingly, the minutes do not contain a discussion of a sale process or market check for C&J, or whether the deal offered the best value reasonably available for C&J's stockholders.  Citi and Tudor calculated that the transaction was worth $30.76 per share for C&J's stockholders, compared to C&J's share price of $32.50 at the time and Citi's determination that C&J was worth $37.38 per share on a standalone basis.

On June 25, Nabors informed Comstock that it was not willing to sign the employment agreements Comstock had proposed or a related side letter. Comstock replied that he would not sign the transaction without guaranteed terms for himself and C&J's management.  Petrello then agreed to sign a side letter regarding Comstock's success bonus and severance payments, at which point Comstock and Petrello announced the proposed transaction.

## C.    The Preliminary Injunction[6]

On July 30, 2014, plaintiff filed its initial complaint alleging breaches of fiduciary duty in connection with the Nabors transaction and requesting, among

---

[5] Compl. ¶ 93.

[6] This Section I.C contains certain facts from the record associated with C&J's motion to recover damages against the injunction bond.  Unless otherwise noted, the additional facts drawn from outside the Complaint are not used in analyzing the motion to dismiss, but are included to provide a coherent narrative and to analyze C&J's motion to recover damages against the injunction bond.

other things, that the transaction be enjoined until C&J adopted a process to obtain the highest possible value for stockholders.[7]  On November 10, 2014, plaintiff moved for a preliminary injunction.

On November 24, 2014, the Court of Chancery issued a preliminary injunction against C&J regarding the Nabors transaction.  On November 25, the parties drafted competing forms of orders to implement the injunction for a 30-day period.  Plaintiff's proposed order stated:

> During the period that this Preliminary Injunction is in effect, the members of the C&J Board of Directors who have not been designated to be directors of C&J Energy Services, Ltd. shall take all steps reasonably necessary to explore whether there are other persons or entities interested in purchasing a controlling stake in C&J, including without limitation retaining an independent financial consultant (the "Advisor").  If after the 30 day period either a potential buyer or additional facts warrant further injunctive relief, the injunction will remain in effect until the Advisor submits to this Court an affidavit ("Affidavit") certifying that the Board has made all reasonable efforts to obtain the best price reasonably available for C&J.[8]

C&J's proposed order stated:

> [C&J] is hereby ordered to solicit alternative proposals to purchase the Company that are superior to the Proposed Transaction, as such term is defined by the Merger Agreement, for a period of 30 days from November 24, 2014. . . . The Company is enjoined from holding its

---

[7] Verified Class Action Compl. 33-34.

[8] Levy Aff. Ex. 2 ¶¶ 1-3.

11

stockholder meeting until the Company has complied with paragraph 1 above.[9]

On November 25, after receiving these proposed orders, the Court entered the following preliminary injunction order (the "PI Order"):

1. C&J Energy Services, Inc. (the "Company"), through its directors who have not been designated to be directors of C&J Energy services, Ltd., is hereby ***ordered to solicit alternative proposals to purchase the Company*** (or a controlling stake in the Company) that are superior to the Proposed Transaction, as such term is defined by the Merger Agreement, for a period of 30 days from November 24, 2014.

2. The solicitation of proposals consistent with this Order and any subsequent negotiations of any alternative proposal that emerges will not constitute a breach of the Merger Agreement in any respect.

3. ***The Company is enjoined from holding its stockholder meeting until the Company has complied with paragraph 1 above***.

4. This order may be extended on application made within 30 days of November 24, 2014, showing a potential buyer, additional facts that warrant further injunctive relief, ***or that it would be appropriate because of the stay authorized in paragraph 7 hereof***.

5. Plaintiff shall post a bond in the amount of $650,000 within three business days.

6. This Court's order and bench ruling of November 24, 2014, are certified to the Supreme Court of the State of Delaware for disposition in accordance with Rule 42 of that Court.

7. ***The Injunction is stayed pending the outcome of Defendants' appeal*** to the Supreme Court of the State of Delaware, or further order of that Court.[10]

---

[9] Levy Aff. Ex. 4 ¶¶ 1, 3.

[10] Levy Aff. Ex. 5 (emphasis added).

12

In sum, the Court ordered C&J to solicit alternative proposals but stayed that order pending appeal. The Court also provided an opportunity to request an extension of the injunction under certain circumstances, including if it was "appropriate because of the stay." The Court further required plaintiff to post a $650,000 bond despite the stay of the injunction.

The evening the PI Order was entered, plaintiff inquired why it was necessary to post a bond given that the injunction had been stayed pending the appeal.[11] The next morning, on November 26, the Court explained in a letter that the bond must be posted for two reasons: "First, the Defendants may decide to comply with the order and, if they do, they are entitled to the protection of the bond. Second, if the stay is lifted or otherwise lapses, the bond should be in effect as of that moment."[12]

At 2:29 p.m. that afternoon, C&J filed a letter with the Court stating that it intended "to pursue its appellate remedy and undertake the required solicitation in parallel. For this reason, C&J respectfully requests that the Court lift the stay immediately."[13] C&J pointed out that "the initial end date in the Merger Agreement is December 31, 2014," and expressed concern that it would not have

---

[11] Levy Aff. Ex. 6.

[12] Levy Aff. Ex. 7.

[13] Levy Aff. Ex. 8.

13

time to appeal the ruling and still comply with the 30-day solicitation requirement if it lost the appeal.[14] At 3:00 p.m., the Court granted C&J's request and lifted the stay, thus making the Court-ordered solicitation process operative in parallel with C&J's appeal.[15] At 3:31 p.m., the Register in Chancery stamped as "FILED" a payment of $650,000 for the preliminary injunction bond. Plaintiff's counsel filed a letter to the Register in Chancery attaching the receipt for that bond at 5:15 p.m.[16]

## D. Post-Injunction Conduct

On November 25, Comstock, in his capacity as C&J's CEO, issued a press release disagreeing with the Court's decision and its conclusion that C&J's board had been obligated to solicit alternate proposals before signing the merger agreement. He noted that C&J planned to appeal the decision and remained "committed to the transaction."[17] According to Friedman, C&J's board had not seen or approved the press release.

On November 26, the board formed a Special Committee consisting of Friedman, Ma, and Stewart, the three directors who had not been offered seats on the New C&J board. The Special Committee was tasked with overseeing the

---

[14] *Id.*

[15] Levy Aff. Ex. 9.

[16] Levy Aff. Ex. 28.

[17] Compl. ¶ 108.

14

required 30-day solicitation process, assessing alternative proposals, and presenting to the board any competing offers that the Special Committee determined were potentially superior to the Nabors transaction.

On November 26, Comstock asked his friend John Bishop, a banker at Morgan Stanley & Co., to serve as the financial advisor for the Special Committee's solicitation process. Bishop was aware that Comstock opposed the Court-ordered solicitation process. When Comstock was negotiating Morgan Stanley's fees, Bishop informed Comstock that he would not lose the engagement "on price."[18] Comstock replied that if Morgan Stanley would take the engagement, it would be "a solid in with the company."[19]

The Special Committee allowed Ted Moore, C&J's General Counsel, to attend all of the committee's meetings and receive all of its materials. Moore served as Morgan Stanley's primary contact during the solicitation process. The Special Committee also retained Paul, Weiss, Rifkind, Wharton & Garrison LLP as its legal advisor. At its first meeting, the Special Committee discussed the likely timing of the appeal of the preliminary injunction to the Supreme Court using a timeline prepared by Vinson & Elkins LLP, whom Comstock retained in connection with the Nabors transaction. Morgan Stanley proposed that the Special

---

[18] Compl. ¶ 113.

[19] Compl. ¶ 114.

Committee assess alternative bids on December 17, around the same day that Vinson & Elkins expected a decision from the Supreme Court.[20]

Through McMullen, Comstock instructed Moore that Morgan Stanley and potential bidders for C&J would not receive confidential information, including forecasts. Morgan Stanley and the bidders thus did not receive such information.

By December 10, 2014, three potential bidders for C&J had emerged: Cerberus Capital Management, SCF Partners, and Apollo Global Management. On December 11, Cerberus made a proposal to combine C&J with Keane Energy, one of Cerberus's portfolio companies, and to provide C&J stockholders with $5.25 per share in cash and a 49% interest in the combined company. The proposal valued C&J at $14.55 per share, excluding synergies. On December 12, 2014, Cerberus signed a non-disclosure and standstill agreement and met with Comstock, McMullen, Moore, and Bishop.

After the meeting, Comstock expressed frustration with Bishop for considering the proposed transaction with Keane, noting that Keane was a much smaller company compared to what Comstock had built at C&J. Bishop told

---

[20] Compl. ¶ 119. The timelines pictured in the Complaint do not match precisely. According to the Complaint, Morgan Stanley's solicitation process timeline envisioned that the Special Committee would review bids on December 16 and the entire board would review them on December 17, while Vinson & Elkins' appeal timeline anticipated that the Supreme Court's decision was expected between December 17 and 19. Compl. ¶ 119. But the Complaint also indicates that Morgan Stanley suggested that the Special Committee wait until December 17 to assess an alternate bid. *Id.*

16

Comstock he understood that the go-shop process was frustrating for Comstock after so much work had gone into the Nabors deal, and reassured him that he remained supportive of Comstock. Bishop also stated that they were "going to run a tight objective go-shop process" to avoid giving the Court of Chancery any reason to doubt their assessment of what other bidders may be willing to offer.[21]

On December 12, Morgan Stanley sent Cerberus a letter in response to its December 11 proposal, inviting Cerberus to bid for a majority stake in C&J and requesting certain detailed offer terms, which allegedly already were included in Cerberus's initial offer.[22] On December 17, Morgan Stanley presented its assessment of the Cerberus bid to the Special Committee. Morgan Stanley's assessment did not include any expected synergies, in contrast to its valuation of the Nabors deal, which included synergies of $67 million but not the cost of implementing those synergies.

Bishop informed the Special Committee that, in order to constitute a superior proposal, Cerberus's offer should be at least 30% above C&J's current stock price but that its offer was only a 12% premium. This guideline was not specifically based on the language of the PI Order or the merger agreement, which defines a "Superior Proposal" as a bona fide written proposal that the board

---

[21] Compl. ¶ 125.

[22] Compl. ¶¶ 126-27.

17

determines in good faith is more favorable to C&J's stockholders from a financial point of view than the Nabors deal. Morgan Stanley did not directly compare the value of the offers because it considered the Nabors deal to be an acquisition of assets rather than a sale of C&J. Plaintiff alleges that Morgan Stanley also made numerous errors in its analysis of the Nabors transaction that overvalued it relative to the Cerberus transaction.

At the December 17 meeting, the Special Committee discussed the potential value of the Cerberus bid and the Nabors transaction. On December 18, Morgan Stanley informed Cerberus that its proposal did not offer enough value to C&J's stockholders. The next day, on December 19, the Delaware Supreme Court reversed the Court of Chancery and lifted the preliminary injunction, thus reinstating the no-shop provision in the merger agreement.

### E. The Proxy and Transaction Closing

After the PI Order was lifted, C&J improved the deal terms by reducing the cash payment it would make to Nabors at closing by $250 million. On February 13, 2015, C&J issued a final proxy statement regarding the Nabors transaction (the "Proxy"). As described later, plaintiff alleges that the Proxy omitted material information and was false in various respects.

18

On March 20, 2015, 97.66% of C&J's stockholders who voted (constituting 81.73% of the outstanding shares) approved the transaction.[23]

## F.    Procedural Posture

On February 27, 2015, C&J filed a motion to recover damages in the amount of $542,087.89 against the $650,000 injunction bond plaintiff had posted in connection with obtaining the preliminary injunction.  On March 25, 2015, C&J moved to dismiss plaintiff's original complaint.  On May 7, 2015, this action was reassigned to me from Vice Chancellor Noble.

On July 24, 2015, plaintiff moved to release the portion of the injunction bond ($107,912.11) that C&J was not claiming.  On July 31, I granted that motion and ordered those funds to be released.

On October 29, 2015, plaintiff filed an amended complaint (as defined above, the "Complaint"), which dropped C&J as a defendant and added Morgan Stanley.  In November and December, the individual defendants, Nabors, and Morgan Stanley moved to dismiss the Complaint.

---

[23] Zieminski Aff. Ex. A (C&J Energy Services, Inc., Current Report (Form 8-K) (March 20, 2015)) at 1.  The Complaint acknowledges that C&J's stockholders approved the Nabors transaction.  Compl. ¶ 22.  I take judicial notice of the publicly filed result of the stockholder vote, which is not subject to reasonable dispute.  *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170-71 (Del. 2006).

On April 26, 2016, oral argument was heard on defendants' motion to dismiss and their motion to recover the balance of the injunction bond. Plaintiff thereafter filed a supplemental submission on May 24, 2016.

## II.    ANALYSIS OF DEFENDANTS' MOTION TO DISMISS

This Court will grant a motion to dismiss under Court of Chancery Rule 12(b)(6) only if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[24] In making this determination, the Court will "accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor."[25] The Court is not required, however, to accept mere conclusory allegations as true or make inferences that are not supported by well-pleaded factual allegations.[26] The Court also "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[27]

The Complaint contains seven claims:

Count I:     Breach of fiduciary duty against Comstock.

Count II:    Breach of fiduciary duty against the Outside Directors concerning the Nabors transaction.

---

[24] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[25] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

[26] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[27] *In re Gen. Motors*, 897 A.2d at 168.

Count III: Breach of fiduciary duty and aiding and abetting against McMullen and Moore.

Count IV: Aiding and abetting against Nabors and New C&J.

Count V: Breach of fiduciary duty against the Special Committee members concerning the solicitation process.

Count VI: Aiding and abetting against Morgan Stanley.

Count VII: Breach of fiduciary duty against Comstock, McMullen, Moore and the Outside Directors concerning disclosures in the Proxy.

I begin by assessing plaintiff's disclosure claim and then turn to the claims for breach of fiduciary duty and for aiding and abetting.

## A. Disclosure Allegations

In Count VII, plaintiff asserts that Comstock, McMullen, Moore, and the Outside Directors breached their fiduciary duties by including false information in, and omitting material information from, the Proxy.[28] Plaintiff further argues that these disclosure violations prevented C&J's stockholders from voting on the Nabors transaction in an informed manner.

Plaintiff did not include a disclosure claim in its original complaint and did not press this claim during its motion for preliminary injunction.[29] Plaintiff added

---

[28] Compl. ¶¶ 184-86; Zieminski Aff. Ex. F (C&J Energy Services, Inc., Definitive Proxy Statement (Schedule 14A) (February 13, 2015)) (the "Proxy").

[29] Verified Class Action Compl., July 30, 2014.

the disclosure claim when it amended its complaint in October 2015, months after the Nabors transaction closed. In doing so, plaintiff did not heed the preference under Delaware law for disclosure claims to be litigated before a stockholder vote so that if a disclosure violation exists, it can be remedied by curing the informational deficiencies, thus providing stockholders with the opportunity to make a fully informed decision.[30] For this reason, defendants argue that plaintiff's disclosure claim should be barred under the doctrine of laches.[31] There is some persuasive force to this argument, considering that plaintiff did not bring its disclosure claim until long after the transaction closed, thus waiting until it was "too late to remedy the harm" with supplemental disclosures.[32]

There is a wrinkle here, however, that leads me to decide the disclosure claim on the merits despite what appears to have been a calculated delay in asserting this claim. As discussed below, defendants argue that, under the Supreme Court's decision in *Corwin v. KKR Financial Holdings LLC*, the C&J directors' approval of the Nabors transaction is subject to the business judgment

---

[30] *See In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360-62 (Del. Ch. 2008).

[31] *See Ryan v. Lyondell Chem. Co.*, 2008 WL 2923427, at *21 n.128 (Del. Ch. July 29, 2008) (noting that defendants "could make a compelling argument that all of [the] disclosure claims ought to be barred by the doctrine of laches" because plaintiff could have moved for a pre-vote preliminary injunction but failed to do so), *rev'd on other grounds*, 970 A.2d 235 (Del. 2009).

[32] *In re Transkaryotic Therapies*, 954 A.2d at 361.

presumption because it was approved by a fully-informed, uncoerced stockholder vote.[33] Thus, the question whether the stockholder base was fully informed is relevant not only to determine whether Count VII states a claim for relief, but also to address defendants' arguments concerning the applicable standard of review for its other fiduciary duty claims. For this reason, I choose to address plaintiff's disclosure claims on the merits.

Under Delaware law, when directors solicit stockholder action, they must "disclose fully and fairly all material information within the board's control."[34] Delaware has adopted the standard of materiality used under the federal securities laws. Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[35] In other words, information is material if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it "significantly alter[s] the 'total mix' of information made available."[36]

---

[33] *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 312 (Del. 2015) ("[T]he doctrine applies only to fully informed, uncoerced stockholder votes, and if troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked.") (Strine, C.J.).

[34] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[35] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard of *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[36] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1277 (Del. 1994).

Using this standard, I address plaintiff's disclosure allegations, which can be grouped into seven categories.

### 1. C&J's Estimate of NCPS's EBITDA

In what it characterizes as its strongest disclosure claim, plaintiff argues that the Proxy contained "false" information regarding *C&J's estimate* of NCPS's EBITDA.[37] To put these allegations in context, it is useful to see what the Proxy said about these estimates in the first place:

> In addition, C&J's management prepared unaudited prospective financial information regarding the C&P Business's anticipated future operations for fiscal years 2015 to 2018, which was derived from the information provided by Nabors to C&J for fiscal years 2015 to 2018 in connection with C&J's due diligence review of the C&P Business. The unaudited prospective financial information provided below includes certain adjustments by C&J management to the prospective financial information provided to C&J by Nabors. . . . These adjustments were based on C&J management's interpretation of financial results for the C&P Business for April through June 2014 and ongoing conversations with Nabors management in connection with C&J's due diligence review of the C&P business, as well as C&J management's view of the outlook for the stimulation and production businesses. C&J has included below a summary of this information to give its stockholders access to certain non-public information that was considered by the C&J board of directors and also provided to C&J's financial advisors in connection with the Merger.

---

[37] *See* Tr. Oral Arg. Mot. Dismiss 95-98.

| | 2015E | 2016E | 2017E | 2018E |
|---|---|---|---|---|
| | | (In millions) | | |
| Total Revenues | $ 2,399 | $ 2,561 | $ 2,668 | $ 2,789 |
| EBITDA* | $ 445 | $ 528 | $ 564 | $ 606 |
| Capital Expenditures | $ 214 | $ 210 | $ 196 | $ 196 |

* Earnings before interest, taxes, depreciation and amortization, excluding non-recurring integration, severance and retention expenses. EBITDA is a non-GAAP financial measure and should not be considered as an alternative to net income (loss) or cash flow data prepared in accordance with GAAP.[38]

Plaintiff alleges that the Proxy did not disclose that C&J's estimate of $445 million in 2015 EBITDA for NCPS in the above table was "(a) the result of Comstock agreeing with Petrello that he would use a 6.5 multiple to get a deal done, thereby providing both C&J and Nabors with a $450 million target; or (b) C&J's management's 'upside case.'"[39] There are a number of problems with these allegations that undermine plaintiff's assertion that the disclosed EBITDA projection was false or that any further disclosure was required.

To start, although plaintiff asserts that the projection was the "result" of "stretching the multiple" on the deal to 6.5,[40] that contention does not follow from specific allegations in the Complaint concerning what it meant to "stretch the

---

[38] Proxy at 96.

[39] Compl. ¶ 146.

[40] Pl.'s Br. in Opp'n 57.

multiple." In particular, the Complaint quotes Comstock as telling Petrello the following on June 19, 2014:

> My current thinking is original valuation of $2.925 was based on 6x 2015 ebitda of $490. To the extent the forecasts come down, I'm willing to stretch to a 6.5x to get it done. 6.5 is a number I can substantiate as it is a blended multiple of the peer group plus one turn.[41]

In other words, Comstock told Petrello he had hoped to pay 6 times NCPS's EBITDA assuming the 2015 EBITDA number was $490 million and, if the 2015 EBITDA forecast declined from that level, was willing to pay up to 6.5 times a lower EBITDA figure in order to close the deal based on the previously agreed valuation of $2.925 billion. Comstock's offer to pay a higher multiple to make up for a lower EBITDA represents a negotiating concession on C&J's part, not an act of concealment or a misstatement of earnings.

Plaintiff's assertion that this concession provided a $450 million "target" merely reflects the mathematical fact that achieving a $2.925 billion valuation at a multiple of 6.5 would require a $450 million earnings figure, which Nabors necessarily would have known. Of course, if Comstock had refused to stretch the multiple from 6.0 to 6.5, the same arithmetic would have led C&J and Nabors to a different "target" of $490 million to reach the same valuation with a multiple of 6.0. What is critically missing from the Complaint is any well-pled allegation that

---

[41] Compl. ¶ 87.

Nabors deliberately manipulated or misstated NCPS's financial data in response to Comstock's concession, and that C&J knew it. Nor is there a well-pled allegation that C&J's own $445 million projection resulted from this "target." Put differently, the Complaint does not plead facts from which it would be reasonable to infer the causal relationship plaintiff suggests, *i.e.*, that the $445 million 2015 EBITDA estimate *resulted* from Comstock's willingness as a negotiator to "stretch" the EBITDA multiple to reach a particular valuation.

Plaintiff's next argument, that the Proxy should have disclosed that the $445 million EBITDA estimate was management's "upside case," also is unavailing. First, the contention that this figure was an upside case cannot be squared with the Supreme Court's analysis of this issue from the preliminary injunction record. It examined affidavits and the documents in question and found that McMullen did not refer to $445 million as an upside case in his e-mail to Comstock, but rather that Comstock added the "upside case" language when forwarding the message to Nabors as a negotiation tactic.[42] Given this finding, which plaintiff has not

---

[42] The Supreme Court stated as follows:

> Although the plaintiffs discovered an email purportedly from C&J's CFO, McMullen, to Comstock calling the $445 million an "upside case," McMullen asserted in an affidavit that $445 represented "management's expected or base case," not an "upside case." McMullen's email did not originally contain the phrase "upside case," but in a version forwarded to Petrello, Comstock added a sentence suggesting that $445 was "an upside case." Comstock submitted an affidavit recalling that he had added the sentence as "a negotiating tactic." Comstock also explained to the Citi

27

addressed, far from being corrective, it would be misleading to characterize the $445 million EBITDA projection as an "upside case."

The Complaint, moreover, alleges that "Comstock never informed the Board, Citi or Tudor that the revised 2015 EBTIDA [sic] estimate of $445 million was an 'upside case' . . . ."[43] As the block quote set forth above demonstrates, the Proxy disclosed the $445 million figure and noted that it and other confidential financial information "was considered by the C&J board of directors and also provided to C&J's financial advisors in connection with the Merger."[44] Thus, even if it were true that management viewed $445 million as an upside case, the board was not made aware of that view according to the Complaint, and thus it would have been misleading to characterize it as such in the Proxy when describing the information the board was provided.[45] For all these reasons, plaintiff has failed to

---

team that his team was comfortable with forecasting EBITDA of $450 million based on their diligence.

*C&J*, 107 A.3d at 1061 n.54 (citations omitted).

[43] Compl. ¶ 91.

[44] Proxy at 96.

[45] Plaintiff also argues that the board would have learned that management's forecasts were an upside case during the injunction process. Pl.'s Br. in Opp'n 57. Considering the Supreme Court's assessment of the record, *see supra* note 42, it would not be reasonable to infer that the board learned this seemingly erroneous fact during the injunction litigation.

state a claim that the disclosure in the Proxy concerning C&J's estimate of NCPS's EBITDA was false.

## 2. Nabors' Estimate of NCPS's EBITDA

The previous section addressed plaintiff's contentions about the Proxy's disclosures concerning *C&J's* estimate of NCPS's EBITDA. Plaintiff also challenges the Proxy's disclosure concerning *Nabors'* estimate of NCPS's EBITDA that it provided to C&J. With regard to the latter issue, the Complaint alleges as follows:

> [T]he Proxy represented that Nabors estimated NCPS's 2014 EBITDA at $376 million when Nabors knew that NCPS's EBITDA was approximately $300 million. Furthermore, the Proxy represented that Nabors estimated NCPS's 2015 EBITDA at $516 million, when Nabors' management had informed KPMG that its best estimate was $387.4 million.[46]

There are two primary problems with this claim.

First, the section of the Proxy disclosing these estimates explains that "Nabors presented certain prospective, unaudited financial information," including the EBITDA figures, to C&J and its financial advisors, which "was not prepared with a view toward public disclosure . . . ."[47] In other words, the Proxy is listing the information that Nabors provided to C&J and its financial advisors. Amending

---

[46] Compl. ¶ 146.

[47] Proxy at 98.

or supplementing those figures with other estimates that were not presented to C&J would misstate the information that C&J actually received from Nabors.

Second, and relatedly, the Complaint alleges that Nabors knew that its own estimates were incorrect, *but not that C&J's board knew* that the estimates were inaccurate or otherwise relied on an alternate set of projections from Nabors.[48] Disclosure in a Proxy to be disseminated to C&J's stockholders of financial estimates outside of the board's knowledge is immaterial.[49]

### 3. Synergies and the Intra-Company Loan

Plaintiff complains that the Proxy did not disclose that "absent purported synergies—including tax synergies resulting from a fictitious $1 billion intra-company loan—the deal represented a negative premium to the standalone implied equity value of C&J."[50] Although plaintiff labels the loan as "fictitious," it does not allege that the loan and its tax benefits were invalid or otherwise would fail to achieve the expected tax synergies. Equally problematic, plaintiff provides no

---

[48] Plaintiff also argues that "Comstock and McMullen invited Nabors to provide unreliable EBITDA projections to further the sales process and purposefully passed that flawed data along to the Board without disclosure of its origin." Pl.'s Br. in Opp'n 55. This allegation is a reprise of plaintiff's "stretch the multiple" theory, which fails to state a claim for the reasons discussed previously.

[49] *See Wayne Cty. Emps.' Ret. Sys. v. Corti*, 954 A.2d 319, 332 (Del. Ch. 2008) (rejecting argument that more recent internal projections must be disclosed because, among other reasons, "there is no evidence in the record that the Activision board relied on these Vivendi projections").

[50] Compl. ¶ 146.

explanation for why a statement of the obvious (*i.e.*, that the failure to attain expected synergies would make the deal less attractive) would significantly alter the total mix of available information. This disclosure claim is thus without merit.

### 4. Comstock's Alleged Threat to Block the Deal

Plaintiff argues that the Proxy should have disclosed Comstock's threat on June 25 that he would not sign the Nabors deal unless Nabors guaranteed employment terms for himself and C&J's management team.[51] According to plaintiff, a reasonable stockholder "would find it material that the Chairman and CEO—who also owned 10% of the Company—refused to support the deal unless his lucrative success bonus was promised in writing."[52]

The Proxy, however, did contain the relevant information surrounding these discussions. Specifically, immediately after describing the board's approval of the transaction on June 24, 2014, the Proxy stated as follows:

> Following the conclusion of the C&J board of directors meeting, C&J, Nabors and their respective counsel finalized the transaction documentation. C&J management indicated that they required greater assurance regarding the arrangements for the Management Team before entering into the transaction, and accordingly Members of the

---

[51] Compl. ¶¶ 99-100, 146. Plaintiff's disclosure claim states that "Comstock threatened to block the deal," Compl. ¶ 146, but the specific language plaintiff alleges Comstock used was: "I'm not prepared to sign for this transaction without guaranteed terms for myself and management team. A side letter was circulated and it, at a minimum, will be necessary for us to gain comfort. It's highly unfortunate this stance was taken at the last minute. We will not be prepared to close as it currently stands." Compl. ¶ 99.

[52] Pl.'s Br. in Opp'n 58.

31

> Management Team and Nabors agreed that the terms of their proposed employment arrangements with [New C&J] would be finalized on substantially the terms previously discussed prior to the mailing of this proxy statement/prospectus. Thereafter, C&J and NIL executed the Original Merger Agreement in the form approved by their respective boards, the Original Separation Agreement and the Support Agreement.[53]

On the previous page, the Proxy defined the term "Management Team" to mean "specifically, Messrs. Comstock, McMullen, Gawick, Prestidge and Moore."[54] Thus, the Proxy did disclose that C&J management told Nabors that the proposed employment arrangements for Comstock (and other managers) needed to be finalized "before entering into the transaction."[55]

The Proxy, furthermore, disclosed the employment terms for Comstock that were agreed to after this alleged "threat" was made.[56] Thus, C&J's stockholders were made aware that Comstock's incentives differed from other stockholders

---

[53] Proxy at 73. I incorporate this text by reference in considering plaintiff's allegations of text missing from the Proxy statement. In doing so, I do not rely on the truth of the content, only that such statements were made in the Proxy.

[54] Proxy at 72.

[55] To insist that this communication be described as a "threat" would amount to self-flagellation that is not required under Delaware law. *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) ("The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing."). It also is open to question whether the so-called threat was even credible, rather than immaterial puffery, given that Comstock's June 25 statement was made after the C&J board had approved the transaction, placing it beyond Comstock's authority to block.

[56] *See* Proxy at 108-11.

because, although he held a large equity stake in the company, he also would receive financial benefits not accruing to the stockholders at large.

### 5. Citi's Alleged Conflict

Plaintiff asserts that the Proxy failed to disclose that "Citi violated its own conflicts policy" by providing deal financing while acting as a financial advisor on the deal.[57]  Plaintiff misstates its own allegations in this regard.  The Complaint alleges that Citi's conflicts policy restricts its ability to earn "significant buy-side financing fees" when giving "sell-side advice."[58]  But plaintiff does not allege that Citi provided buy-side financing (*i.e.*, financing for Nabors to make a payment to C&J), because the reverse was true:  Nabors was to receive $940 million in cash in the transaction, not pay it.[59]  Consequently, plaintiff's own allegations do not support the conclusion that Citi violated its conflicts policy.

Contrary to plaintiff's assertion, the Proxy provided adequate disclosures concerning Citi's role in providing financing.  It specifically disclosed:

---

[57] Compl. ¶ 146.

[58] Compl. ¶ 74.

[59] Compl. ¶¶ 73-74, 139.  One could argue that the financing issue is not quite that simple because New C&J, the combined entity, would retain the debt obligation. Compl. ¶ 73. This does not alter my analysis because Nabors, the "buyer" in the transaction under plaintiff's own theory, is undisputedly the entity being paid the cash.  At most, it can be argued that Nabors exercised control over the entity undertaking the financing obligation after the transaction closed.  That, in my view, does not convert Citi's role into providing buy-side financing, when the alleged buyer is the entity receiving cash.

33

Citi and its affiliates are also participating in the financing for the Transactions, including acting as lead arranger for such financing, for which services Citi and its affiliates will receive an aggregate fee currently estimated to be up to approximately $19.6 million.[60]

For these reasons, plaintiff's allegations regarding Citi's conflict policy and disclosures of its role in financing the transaction fail to state a disclosure claim.

### 6. Disclosures Related to the Court-Ordered Solicitation Process

The Proxy contained the following disclosure concerning the solicitation process that this Court ordered:

> On November 24, 2014, the Court of Chancery entered a bench ruling, followed by a written order (the "Order") on November 25, 2014, that (i) ordered certain members of the C&J board of directors to solicit for a period of 30 days alternative proposals to purchase C&J (or a controlling stake in C&J) that are superior to the Transactions, and (ii) preliminary enjoined C&J from holding its stockholder meeting until it complied with the Order. . . .
>
> On November 26, 2014, in response to and in compliance with the Order, the C&J board of directors authorized a special committee of independent directors who have not been designated to serve on the combined company's board of directors following consummation of the Merger (the "Special Committee") to conduct the solicitation of acquisition proposals consistent with the Order and evaluate any alternative proposal received. The Special Committee engaged Morgan Stanley & Co. . . . as its financial advisor in connection with the solicitation and Paul, Weiss, Rifkin, Wharton & Garrison LLP . . . as its legal advisor in connection with the solicitation.
>
> At the request of the Special Committee, Morgan Stanley contacted 46 strategic parties and 36 financial parties that might potentially be interested in making an acquisition proposal that could

---

[60] Proxy at 95.

34

be superior to the Merger. In response to the solicitation, C&J entered into confidentiality and non-disclosure agreements with two of the parties and, at the request of such parties, held high level discussions with C&J's management team. One of such third parties submitted an acquisition proposal to C&J on December 11, 2014. After evaluating the acquisition proposal with Morgan Stanley and Paul Weiss, the Special Committee determined that such acquisition proposal was not reasonably likely to lead to a superior proposal in accordance with the terms of the Merger Agreement.[61]

Plaintiff identifies a laundry list of issues concerning this disclosure. Specifically, it alleges that the Proxy failed to disclose "that the Cerberus bid included a $5.25 per share cash dividend for C&J stockholders," "that Morgan Stanley never received C&J forecasts or other confidential information concerning C&J's performance while it purportedly assessed the value of the Cerberus bid," "that Morgan Stanley did not include any synergies in its assessment of the value of the Cerberus bid," "that Morgan Stanley continued to analyze the Nabors Deal as an acquisition of assets and never provided the Special Committee with a comparison of the value of the Cerberus bid with the value of the Nabors Deal for C&J stockholders," and "that Morgan Stanley and C&J management refused to provide any confidential information to Cerberus and other potential bidders, even after they signed an NDA with a standstill provision."[62]

---

[61] *Id.* at 73-74.

[62] Compl. ¶ 146.

35

In essence, plaintiff argues that C&J should have given stockholders more information regarding the potential alternate bidders who materialized during the Court-ordered solicitation process, in particular Cerberus, more information about Morgan Stanley's and the Special Committee's interactions with those bidders, and more details about Morgan Stanley's financial analysis. Some of these allegations restate as disclosure claims plaintiff's substantive arguments regarding Morgan Stanley's and C&J's assessment of the Cerberus bid, such as Morgan Stanley's decision to treat the Nabors transaction as an asset acquisition or not to include synergies in valuing the Cerberus bid. "[Q]uibbles with a financial advisor's work simply cannot be the basis of a disclosure claim."[63] Regarding plaintiff's argument that details of the Cerberus bid should have been disclosed to stockholders, moreover, Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing.[64]

As alleged in the Complaint, the Special Committee proposed to the C&J board that Morgan Stanley be permitted to tell Cerberus that its proposal "did not

---

[63] *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009).

[64] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008); *Skeen v. Jo-Ann Stores, Inc.*, 1999 WL 803974, at *8 (Del. Ch. Sept. 27, 1999) ("Because no firm offer was made, the board had no duty to disclose any of the specifics of HF's negotiations with that entity."), *aff'd*, 750 A.2d 1170 (Del. 2000).

offer enough value to C&J stockholders" to be superior to the Nabors transaction.[65]

Consistent with this allegation, the Proxy disclosed that the Special Committee had determined that the Cerberus bid was not reasonably likely to lead to a proposal superior to the Nabors transaction. Plaintiff's substantive disagreement with that decision cannot be recast as a disclosure claim. Plaintiff essentially argues that the stockholders should have been informed about the offer in case they, too, disagreed with the Special Committee.[66] The board was not obliged to do so under Delaware law, which does not require disclosing details about offers that directors conclude are not worth pursuing.[67]

Finally, the unique posture of this case provides another reason why the details of the Cerberus transaction did not need to be disclosed. In addition to the fact that the Special Committee determined that the offer was not reasonably likely to lead to a proposal superior to the Nabors transaction, as was disclosed in the Proxy, the reversal of the preliminary injunction reinstated the no-shop provision

---

[65] Compl. ¶ 142.

[66] Mot. Dismiss Tr. 100 ("[T]his would have been the last chance for the stockholders to say, You know what? I disagree. I will vote down this proposal and take my chances that Cerberus is still interested. So just saying that somebody had submitted a proposal without giving more detail, not full and fair disclosure, deprived the stockholders from a full and fair vote.").

[67] *David P. Simonetti Rollover IRA*, 2008 WL 5048692, at *12 ("In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required.").

and thus prevented the board from pursuing the Cerberus transaction further in any case. For these reasons, plaintiff cannot establish a substantial likelihood that a reasonable stockholder would consider the various details surrounding the Cerberus transaction and the analysis of it to be important in deciding how to vote.

### 7. Claims Relating to Morgan Stanley's Alleged Conflicts

Plaintiff asserts that the Proxy should have disclosed certain information calling into question Morgan Stanley's independence as the Special Committee's financial advisor. Specifically, the Complaint challenges the omission from the Proxy that Comstock was friends with Bishop, Morgan Stanley's representative to the Special Committee, and that Comstock had told Bishop it would be a "solid in with the company" if he accepted the financial advisor role.[68]

As an initial matter, because the solicitation process became a nullity when the Supreme Court reversed the preliminary injunction, questions concerning the integrity of that process logically would have ceased to be meaningful to stockholders. Thus, in my view, Morgan Stanley's potential conflicts were not material to stockholders at the time they were asked to vote on the Nabors transaction.

But even if the solicitation process did continue to be meaningful to C&J's stockholders, plaintiff's allegations do not rise to the level of materiality for other

---

[68] Compl. ¶ 146.

38

reasons as well.  Friendship alone has been rejected by this Court as a basis to impugn the independence of a financial advisor.[69]  The inquiry instead must be more textured to take into account the overall circumstances of the engagement. Here, the circumstances were that the Court had entered an injunction mandating a highly expedited solicitation process just two days before Thanksgiving and that Comstock's statement that the work would "be a solid in with the company"[70] was made in the context of negotiating fees, after Bishop opined that the fees Comstock was offering were low.[71]  Potential fees or other business with the company does

---

[69] *In re Inergy L.P.*, 2010 WL 4273197, at *14 (Del. Ch. Oct. 29, 2010) (finding that the decision of a one-person special committee to hire a "longstanding" friend of the CEO was not unreasonable under the circumstances).

[70] Compl. ¶ 13.

[71] *See* Thomas Aff. Ex. 13 (full text of the e-mail discussion).  Plaintiff relied on the quoted e-mail chain in its Complaint by selectively quoting the "solid in" portion of the message multiple times.  *See* Compl. ¶¶ 13, 114, 146.  I consider the remaining text of the e-mail chain to be incorporated by reference into the Complaint to put the quotations in their proper context.  In my view, "there is no concern that [plaintiff] would not have notice that the defendants would want to put those selective quotations in context . . . ." *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) (Strine, C.).  This is particularly true in light of the fact that, in addition to quoting the e-mails multiple times in its Complaint, plaintiff submitted the full e-mail thread in an affidavit regarding the injunction bond motion.  Thomas Aff. Ex. 13.  Finally, although considering the quoted e-mails in their full context is useful, my analysis would not change because, absent any explanatory context, the one-line quotation (quoted three times in the Complaint) is too vague to lead to a reasonable inference one way or another.

not in itself constitute a material conflict of interest.[72] This is particularly apt here, where the suggestion of future business with the company was made to entice a well-qualified advisor to accept an unusually low fee for an assignment that had to be performed under far less than ideal conditions. Taking into account the context of Morgan Stanley's retention, the alleged omissions concerning Morgan Stanley would not have been important to a reasonable stockholder in deciding how to vote on the Nabors transaction.

\* \* \* \* \*

For the reasons detailed above, plaintiff's disclosure-related allegations fail to state a claim, and Count VII is thus dismissed.

## B. Fiduciary Duty Claims

The Complaint asserts four claims for breach of fiduciary duty seeking post-closing damages. Counts I and III are asserted against three insiders (Comstock, McMullen, and Moore) for their respective roles in the Nabors transaction and the solicitation process. Counts II and V are asserted against outside directors. Specifically, Count II is asserted against all five of the Outside Directors for their

---

[72] *See Solomon v. Armstrong*, 747 A.2d 1098, 1119 (Del. Ch. 1999) ("The payment structure and relationship histories do not form a sufficient basis for the inference that these investment banks were willing to opine, or lean toward, better terms for GM during the negotiation of the transaction."), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

role in the Nabors transaction, and Count V is asserted against the three members of the Special Committee for their role in the solicitation process.

In selling control of a corporation, the actions of a board of directors are subject to enhanced scrutiny under *Revlon* and its progeny, which involves an assessment of the board's decision-making process and the reasonableness of their actions under the circumstances.[73]  As the Supreme Court explained last year in *Corwin v. KKR*, the enhanced scrutiny of *Revlon* (and *Unocal*) was "primarily designed to give stockholders and the Court of Chancery the tool of injunctive relief to address important M&A decisions in real time, before closing," and was not a tool "designed with post-closing money damages claims in mind."[74]

Focusing on the post-closing context, the Supreme Court held in *Corwin* that if a transaction that is not subject to entire fairness is approved by a fully informed, uncoerced vote of stockholders, *Revlon* review does not apply and the appropriate standard for a post-closing damages action is the business judgment rule.[75]  The Supreme Court further explained earlier this year that, in such cases, dismissal is typically the result because the transaction then can be attacked only on grounds of waste, a concept that has "little real-world relevance" in an M&A transaction

---

[73] *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

[74] *Corwin*, 125 A.3d at 312.

[75] *Id.*

because "stockholders would be unlikely to approve a transaction that is wasteful."[76]

Plaintiff does not allege that the Nabors transaction amounted to waste or that the stockholder vote on the Nabors transaction was coerced and, as I concluded above, plaintiff has failed to allege that C&J's stockholders were not fully informed when they voted to approve that transaction. Consequently, unless plaintiff can establish a basis for applying entire fairness to the Nabors transaction, each of its fiduciary duty claims must be dismissed under a straightforward application of *Corwin* and *Attenborough*.[77]

Plaintiff advances essentially two arguments for invoking entire fairness: (1) that a majority of the C&J board was interested in the Nabors transaction because of their desire to obtain board seats in the surviving entity, and (2) that Comstock tainted the process by which the board considered the transaction. Neither argument has merit.

---

[76] *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016) (ORDER).

[77] Because I conclude that *Corwin* applies, I do not opine on defendants' separate argument that *Revlon* does not apply because of certain control-limiting provisions in the transaction. *See* C&J Defs.' Op. Br. 21-24.

### 1. The Complaint Fails to Allege that a Majority of the C&J Board Was Interested in the Nabors Transaction

To rebut the business judgment presumption that a board acted loyally, a plaintiff must allege that "the *board* was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders."[78] "If a plaintiff alleging a duty of loyalty breach is unable to plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence, the entire fairness standard of review is not applied and the Court respects the business judgment of the board."[79]

C&J's board consisted of seven directors: Comstock, McMullen, Friedman, Ma, Roemer, Stewart, and Wommack. The five directors other than Comstock and McMullen were outside directors. Although the argument was not prominently featured in plaintiff's brief, the Complaint alleges and plaintiff's counsel reiterated at oral argument that a majority of the C&J board was interested in the Nabors transaction because of "the prospect of five years of unassailable board seats."[80]

---

[78] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002).

[79] *Id.* at 23.

[80] Compl. ¶ 110; Compl. ¶ 7 ("A majority of C&J's Board would receive guaranteed seats on the board of New C&J for at least five years."); *see also* Tr. Oral Arg. Mot. Dismiss 71-73, 76. The Complaint at one point alleges that the seats were for six years. Compl. ¶ 163 ("Motivated in part by their own selfish interest in guaranteed six-year board seats on the New C&J board, the Director Defendants allowed Comstock to negotiate the Nabors

This allegation is wholly insufficient to establish that a majority of the board members were interested in the Nabors transaction.

As an initial matter, not all of C&J's directors stood to receive seats on the New C&J board. To the contrary, as the Complaint alleges, only four of the seven directors would be nominated to New C&J's board if the Nabors transaction was approved.[81] Consequently, even if a director may have thought he or she had some chance—perhaps even a high likelihood—of joining the board of New C&J, approving the transaction entailed giving up his or her current position in exchange for an uncertain future position.[82]

More importantly, the Complaint is devoid of any allegations that securing a board seat with New C&J for two staggered terms created a disabling conflict of interest for any of the Outside Directors. This Court has previously commented that the enticement of a future seat on the board of the company surviving a merger is not sufficient to disqualify that director from making a disinterested decision on the basis of financial interest.[83] Even if the prospect of obtaining a board seat in a

---

Deal on terms that were highly favorable to Comstock at the expense and to the significant detriment of C&J's stockholders."). This does not change the analysis.

[81] Compl. ¶ 54.

[82] Which board members would join New C&J was not formally determined until the day the Nabors transaction was approved. Compl. ¶ 54.

[83] *Orman v. Cullman*, 794 A.2d at 28-29 ("No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he

44

surviving entity theoretically could create a disabling conflict of interest, "when a party challenges a director's action based on a claim of the director's debilitating pecuniary self-interest, that party must allege that the director's interest is material to that director."[84]

Here, plaintiff, who had the opportunity to take discovery in aid of its preliminary injunction motion before amending its complaint, fails to make any factual allegations to support a reasonable inference that a seat on the board of New C&J would be material to any of the five Outside Directors.[85] Even assuming for the sake of argument that Comstock and McMullen had a meaningful interest in obtaining board seats to protect their future managerial interests, the outsiders formed a disinterested majority of directors on the C&J board. Thus, plaintiff's

---

will be a director in the surviving corporation. To the contrary, our case law has held that such an interest is not a disqualifying interest. . . . Because Orman alleges no facts in addition to the assertion of continued board membership on the part of Barnett, his assertion of interest fails as a matter of law.").

[84] *Solomon v. Armstrong*, 747 A.2d at 1118; *see also In re Gen. Motors*, 2005 WL 1089021, at *8 ("First, it is well settled that plaintiffs' allegations of pecuniary self-interest must allow the Court to infer that the interest was of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest.") (internal quotation marks omitted).

[85] The only allegations that remotely bear on their individual financial circumstances concern the amounts two of these individuals received for their past C&J board service. *See* Compl. ¶¶ 31 (Roemer receiving $500,000 in total compensation between 2011 and 2013), 33 (Wommack receiving $490,000 in total compensation between 2011 and 2013). Plaintiff alleged nothing related to the compensation of Ma, Friedman, or Stewart.

attempt to invoke entire fairness review based on an alleged interest in serving on the New C&J board is without merit.

### 2. The Complaint Fails to Allege Facts Demonstrating that Comstock Deceived the C&J Board

Plaintiff also argues that, even if a majority of the C&J board was disinterested in the Nabors transaction, entire fairness must apply because Comstock, acting in his own interest, tainted the board's process of considering the transaction. In *Mills Acquisition Co. v. Macmillan, Inc.*, the Supreme Court held that the business judgment rule will not apply "in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries."[86] In order to rebut the business judgment rule on this basis, plaintiff must allege that Comstock was acting out of self-interest and that he deceived the rest of the board into approving the transaction.

Comstock's interest in the transaction is subtler than plaintiff suggests. Although Comstock presumably expected to receive a lucrative employment package in his role at New C&J, plaintiff does not allege that his new compensation terms would constitute a material increase from his existing ones. Nor does plaintiff allege that Comstock's position heading C&J was in jeopardy or that Comstock pushed for the Nabors transaction to avoid a different deal that

---

[86] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989).

would have had a worse outcome for him. The lack of such allegations undercuts plaintiff's argument that Comstock simply was acting out of self-interest.[87] Indeed, Comstock's ownership of a 10% stake in C&J created a strong countervailing incentive for him to maximize the value of C&J's stock. In addition, unlike in *Macmillan*, which involved management's self-interested actions in favoring a management buyout over a third-party offer,[88] there was no such prospect of a transfer of control to Comstock here.

The allegations concerning Comstock closely resemble those that Chancellor Chandler found insufficient to state a claim under *Macmillan* in *Wayne County Employees' Retirement System v. Corti*. In *Corti*, Activision's Chairman and CEO (Kotick) and another board member (Kelly), who engineered the disputed sale of Activision to Vivendi, were alleged to receive "substantial benefits under [their] new employment agreements."[89] The Court nonetheless declined to apply the *Macmillan* analysis, concluding instead that the complaint was "not sufficient to support a claim that Kotick and Kelly were interested in the transaction or otherwise violated their fiduciary duty of loyalty . . . ."[90] In making this

---

[87] *See Corti*, 2009 WL 2219260, at *11.

[88] *Macmillan*, 559 A.2d at 1272.

[89] *Corti*, 2009 WL 2219260, at *12.

[90] *Id.* at *13.

47

determination, the Court found the security of their existing employment situation particularly important:

> Significantly, the factual allegations in the Complaint do not suggest that Kotick and Kelly's jobs were ever in danger. There is no allegation that there was a bidder threatening to take over Activision and replace management. There is no allegation that Kotick and Kelly would be removed as managers if Activision did not pursue a transaction with Vivendi. Moreover, plaintiff alleges that from the start of negotiations Vivendi assumed Kotick and Kelly's roles in the combined company. That Kotick and Kelly did not have to pursue the transaction with Vivendi in order to retain their positions as managers significantly alleviates the concern that Kotick and Kelly were acting out of an impermissible "entrenchment" motive. When Vivendi's assumption regarding Kotick and Kelly's roles is added to the analysis, plaintiff's "entrenchment" theory fails completely.[91]

Similarly here, there is no allegation that Comstock's position was in danger or that his new employment terms were materially different than his existing terms.[92] In addition, just as the directors in *Corti* owned a meaningful portion (7.5% in total) of the company's common stock, "which gave Kotick and Kelly an incentive to obtain a higher price for Activision shares,"[93] Comstock's 10% stake in C&J provided an equally strong incentive to maximize stockholder returns, and

---

[91] *Id.* at *11.

[92] Plaintiff alleges the compensation was "so material to Comstock that he almost blew up the transaction when his compensation proposal was not agreed to prior to execution of the Nabors Deal." Pl.'s Br. in Opp'n 32. Considering those negotiations occurred after C&J's board had approved the transaction, the reasonable inference is that Comstock was using a negotiation tactic.

[93] *Corti*, 2009 WL 2219260, at *12.

48

therefore his own. Finally, the Court in *Corti* pointed out another important distinction from *Macmillan* that is also present here:

> There is much less cause for concern where managers will continue their employment with the combined post-transaction entity, than when the conflicted managers are bidders in an auction for control of the company, and are thereby seeking to transfer control of the company to themselves personally.[94]

Comstock's large equity position helped to align his interests with stockholders, his employment offer is not alleged to be materially different than his existing terms, and there was no temptation for Comstock to tip the scales in favor of a transaction that would give him control of the combined entity as a stockholder. Consequently, plaintiff has failed to allege facts showing the type of material self-interest that was present in *Macmillan*. That reason alone would seem sufficient to undermine plaintiff's argument for entire fairness under *Macmillan.*

Even if plaintiff could demonstrate a material self-interest, moreover, the Complaint lacks allegations of deception that also are required to trigger entire fairness under *Macmillan*. In *Macmillan*, management skewed a transaction in favor of the buyout they desired by misleading the board about the auction process. In particular, management's financial advisor, in the presence of a complicit CEO and COO, misled the board about the fairness of the bidding process:

---

[94] *Id.* at *13.

Wasserstein falsely claimed that the advisors had conducted "a level-playing field auction where both parties had equal opportunity to participate." Additionally, in answer to questioning, Wasserstein mistakenly assured the board that he had been the "only conduit of information" during the process and, falsely, that both parties had received *identical* information during the auction. Despite the obvious untruth of these assertions, Evans and Reilly remained silent, knowing also that Evans had clandestinely, and wrongfully, tipped Maxwell's bid to KKR.[95]

Here, plaintiff's allegations do not come close to the type of duplicitous conduct that was condemned in *Macmillan*. For instance, although plaintiff criticizes Comstock and McMullen for "keeping the other directors in the dark" about Comstock's skepticism regarding Nabors' financials,[96] the Complaint does not allege that Nabors' financials were presented to the board. Rather, it can be inferred from the Complaint that C&J management constructed its own projection for NCPS's 2015 EBITDA of $445 million based on its analysis of information received from Nabors.[97] This $445 million 2015 EBITDA projection was provided to Citi and Tudor and used in their fairness presentations to the board.[98] In other words, plaintiff's allegations do not demonstrate that Comstock or anyone else

---

[95] *Macmillan*, 559 A.2d at 1277.

[96] Pl.'s Br. in Opp'n 32.

[97] *See* Compl. ¶¶ 79-82, 89-92; *see also* Proxy at 96 (explaining that EBITDA projections included C&J management's adjustments and interpretations of NCPS's results and Nabors' projections for NCPS).

[98] Compl. ¶ 91.

misled C&J's board with respect to management's views of Nabors' or NCPS's financials.

Turning to management's $445 million EBITDA projection itself, plaintiff's primary critique is that management did not inform Citi or the board that it was an "upside case" and not their baseline projection. But, as discussed above, the preliminary injunction's appellate record reflects that this estimate was "management's expected base case" and not an "upside case," and that Comstock added the words "upside case" as a negotiation tactic.[99] Given this evidence, which the Supreme Court considered in reversing the preliminary injunction and which plaintiff has failed to address, the Complaint's assertion that the $445 million EBITDA figure was an "upside case" is not supported by well-pled factual allegations in my view to warrant making the very serious charge that Comstock intended to deceive the C&J board.

Plaintiff also alleges that Comstock deceived the board by failing to inform it of various steps he took while negotiating the transaction. For instance, plaintiff alleges that Comstock did not disclose an early discussion with Petrello regarding C&J management's potential future contracts with New C&J, or Comstock's motives for negotiating the transaction, as plaintiff interprets them. Significantly, however, plaintiff does not allege that management's eventual future roles were

---

[99] See *C&J*, 107 A.3d at 1061 n.54; *see also supra* notes 4, 42.

never disclosed to the board,[100] or that the critical deal terms Comstock negotiated, such as the EBITDA multiple, were hidden from the board.

Plaintiff's allegation that Comstock "usurped the Special Committee process to protect the Nabors Deal" fares no better under a *Macmillan* theory. The Complaint alleges that the Special Committee allowed Moore to attend its meetings and to serve as Morgan Stanley's point of contact despite "knowing that his personal allegiance was to Comstock and the Nabors Deal,"[101] and that Comstock, McMullen, and Moore prevented Morgan Stanley and any potential bidders from receiving any confidential C&J information, including forecasts.[102] But the Complaint alleges no deception in connection with these allegations. The Complaint does not allege that the Special Committee was unaware of Moore's role—just the opposite, he attended the Special Committee's meetings—or that Morgan Stanley failed to inform the Special Committee about its decision to withhold information from prospective bidders. Nor does the Complaint allege

---

[100] The absence of such allegations is not surprising given that the Proxy shows the opposite. *See* Proxy at 20-21 ("[T]he members of the C&J board of directors were aware of the fact that the C&J management team had proposed new arrangements to [Nabors] and of the terms of such proposal and the C&J board of directors also considered this, among other matters, in evaluating the Merger Agreement and the Merger, and in recommending to C&J stockholders that the Merger Agreement be adopted.").

[101] Compl. ¶¶ 117-18.

[102] Compl. ¶ 120.

that management or Morgan Stanley deceived the Special Committee about Morgan Stanley's valuation techniques.

To sum up, plaintiff's theory that Comstock, to advance his own self-interest, intentionally deceived the board in connection with its consideration of the Nabors transaction and the Special Committee's work on the solicitation process is unsupported by any well-pled allegations or reasonable inferences drawn from the Complaint. Thus, plaintiff has failed to demonstrate the type of deceitful conduct necessary to trigger entire fairness under a *Macmillan* theory.

\* \* \* \* \*

Plaintiff's remaining fiduciary duty allegations amount to quarrels concerning the level of care and the reasonableness of the process the board used to evaluate and approve the Nabors transaction, and that the Special Committee and Morgan Stanley undertook in connection with the solicitation process.[103] These allegations lack the type of self-interested deceptive conduct required for

---

[103] For instance, plaintiff alleges that the Outside Directors "(i) ignored Comstock and Management's potential conflicts of interest; (ii) let Comstock commandeer the sales process; (iii) did not conduct the type of assessment of the value of NCPS warranted by its non-public nature; (iv) did not run the process like it was a sale of C&J; (v) never considered why the deal provided no control premium for stockholders; and (vi) approved the deal based on incomplete and misleading information," and that the Special Committee "(i) permitted the Insiders [to] influence every aspect of the solicitation process; (ii) ignored potential Morgan Stanley conflicts; (iii) did not compare the current value of the Nabors Deal or the Cerberus Bid; (iv) timed the solicitation process to be shut down with the appeal; and (v) analyzed the Cerberus Bid and Nabors Deal based on incomplete and misleading information." Pl.'s Br. in Opp'n 50-51.

53

plaintiff to show that the board was defrauded.[104] Such allegations presumably would be sufficient to sustain a claim under the enhanced scrutiny standard of *Revlon* but, as explained above, that standard is not applicable to a post-closing action for damages where the transaction has been approved by an uncoerced, fully-informed vote of the stockholders.

Because the Nabors transaction is not subject to entire fairness review and the business judgment presumption applies under *Corwin*, plaintiff's fiduciary duty claims against the C&J directors must be dismissed.[105] Under Delaware law, officers owe the same fiduciary duties as directors.[106] Thus, for the same reasons that plaintiff's fiduciary duty claims against the C&J directors fail to state a claim for relief, plaintiff's claims challenging actions taken by Comstock, McMullen, and Moore in connection with the Nabors transaction or the solicitation process in

---

[104] *See Macmillan*, 559 A.2d at 1279 (applying entire fairness because "[h]ere, not only was there such deception, but the board's own lack of oversight in structuring and directing the auction afforded management the opportunity to indulge in the misconduct which occurred."); *see also In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 836 (Del. Ch. 2011) (quoting *Macmillan* and describing deceptive conduct amounting to a "fraud upon the board").

[105] *See Singh v. Attenborough*, 137 A.3d at 152 (noting that in such cases "dismissal is typically the result"); *Corwin*, 125 A.3d at 312-13 ("Finally, when a transaction is not subject to the entire fairness standard, the long-standing policy of our law has been to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves.").

[106] *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

54

their capacity as officers also must be dismissed. For these reasons, Counts I, II, III,[107] and V are dismissed.[108]

### 3. Aiding and Abetting Claims

Count III of the Complaint asserts, in the alternative, that McMullen and Moore aided and abetted the breaches of fiduciary duty of Comstock, the C&J board, and the Special Committee.[109] Count IV asserts that Nabors and New C&J aided and abetted the breaches of fiduciary duty of Comstock, McMullen, and the C&J board.[110] Count VI asserts that Morgan Stanley aided and abetted breaches of fiduciary duty of the Special Committee, Comstock, McMullen, and Moore.[111]

A claim for aiding and abetting a breach of fiduciary duty cannot survive if the underlying fiduciary duty claims do not.[112] Thus, because each of plaintiff's

---

[107] Count III is dismissed in part for these reasons. The part of the Count relating to aiding and abetting is dismissed for reasons explained in the next section.

[108] Even if I had concluded that Comstock had tainted the transaction such that entire fairness would apply, the Outside Directors (for their service on the board as well as on the Special Committee) would be subject to dismissal due to the presence of a 102(b)(7) provision and the absence of claims amounting to bad faith or disloyalty. *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1187 (Del. 2015) (Strine, C.J.); Zieminski Aff. Ex. C at art. 9.

[109] Compl. ¶ 167.

[110] Compl. ¶ 171.

[111] Compl. ¶ 181.

[112] *See Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013) ("Gerber has not stated a claim for breach of fiduciary duty. Accordingly, his claim for aiding and abetting a breach of fiduciary duty must also fail."); *In re Alloy, Inc.*, 2011

fiduciary duty claims fails to state a claim for relief, plaintiff's claims for aiding and abetting a breach of fiduciary duty also must be dismissed. Accordingly, Counts III, IV, and VI are dismissed.[113]

## III. ANALYSIS OF C&J'S MOTION TO RECOVER DAMAGES AGAINST THE INJUNCTION BOND

C&J seeks to recover $542,087.89 in damages against the cash bond that plaintiff posted to secure the preliminary injunction. These damages represent costs incurred in complying with the preliminary injunction the Court issued on November 24, 2014, which the Delaware Supreme Court reversed on December 19, 2014. Specifically, the damages consist of $366,932.90 paid to Morgan Stanley as the Special Committee's financial advisor;[114] $109,958.99 paid to Paul, Weiss, Rifkind, Wharton & Garrison LLP as the Special Committee's legal

---

WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability."); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) ("Since I find that there was no breach of fiduciary duty by Live's directors, Goodwin's aiding and abetting claims also fail."), *aff'd*, 741 A.2d 16 (Del. 1999).

[113] Plaintiff's claim against McMullen and Moore for aiding and abetting a breach of fiduciary duty also fails because, as directors and/or officers of C&J, they are themselves fiduciaries. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must demonstrate, among other things, "knowing participation in the breach by a defendant who is *not* a fiduciary . . . ." *In re Transkaryotic*, 954 A.2d at 370 (emphasis added).

[114] Levy Aff. Ex. 18.

advisor;[115] $32,196 paid to Vinson & Elkins for assisting C&J in complying with the PI Order;[116] and $33,000 paid to C&J's directors for attending two board meetings and four Special Committee meetings in connection with the PI Order.[117]

## A. Legal Standard

Court of Chancery Rule 65(c) requires that the applicant for a preliminary injunction post a bond "in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."[118] "Rule 65(c) does not focus on the conduct of the applicant, but on the potential for harm to the enjoined or restrained party."[119] There is an implicit, although rebuttable, presumption in favor of awarding damages for a wrongful injunction.[120] "An injunction is 'wrongful' if reversed on appeal or if the enjoined party at all times had the right to do the

---

[115] Levy Aff. Ex. 19.

[116] Levy Aff. ¶ 23, Exs. 20-21.

[117] *See* Friedman Aff. ¶¶ 4-11.

[118] Ct. Ch. R. 65(c).

[119] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1226 (Del. 1999).

[120] *Id.*; *see also Emerald P'rs v. Berlin*, 712 A.2d 1006, 1010 (Del. Ch. 1997) (comparing "automatic damages" standard and the preferable "judicial discretion" standard that establishes a rebuttable presumption of entitlement to provable damages), *aff'd*, 726 A.2d 1215.

enjoined act."[121] A wrongfully enjoined party is entitled to damages proven by a preponderance of the evidence as being proximately caused by the wrongful injunction.[122]

## B. The Injunction Was Wrongful and Proximately Caused C&J's Damages

The preliminary injunction was "wrongful" because the Supreme Court reversed the PI Order on appeal.[123] The original grant of the injunction need not have been an abuse of the Court's discretion to be considered wrongful.[124] The presumption in favor of awarding damages to the enjoined party is supported by the purpose of an injunction bond to "protect a party that is wrongfully enjoined"[125] by compensating that party for injuries or costs incurred in complying with the injunction. An enjoined party typically is entitled to receive the damages

---

[121] *Emerald P'rs*, 726 A.2d at 1226.

[122] *Id.* at 1227. Therefore, in contrast to analyzing defendants' motion to dismiss, I may consider evidence the parties have submitted in deciding this motion. *See Emerald P'rs*, 712 A.2d at 1010-11 (allowing the parties to schedule an evidentiary hearing to present the issue of damages).

[123] *See id.* at 1011 ("Defendants were 'wrongfully enjoined or restrained,' for the purposes of Rule 65(c), because the Supreme Court dissolved this Court's injunction.").

[124] *Id.* at 1009.

[125] *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 471 (Del. 2010).

it can prove were proximately caused by the wrongful injunction.[126] "Proximate cause exists if a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred."[127]

C&J's requested damages consist of expenses it incurred as a result of the injunction, namely fees paid to the Special Committee's financial advisor and legal advisor, to C&J's legal advisor for work relating to the solicitation process, and to board members for additional meetings relating to the injunction and the solicitation process. It is undisputed that these expenses stemmed from the preliminary injunction. The injunction was the impetus of forming the Special Committee, hiring its advisors, and holding the associated director meetings.

Similar transaction-related expenses have been subject to a damages claim against an injunction bond. In *Emerald Partners*, the Court of Chancery awarded damages against an injunction bond based on the amount of time that the company's Chief Executive Officer and Chief Operating Officer spent complying with a wrongfully issued injunction, estimating the cost of the time spent based on

---

[126] *See Emerald P'rs*, 726 A.2d at 1227; Ct. Ch. R. 65(c) (noting that injunction bond is to pay for "costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined").

[127] *Wilm. Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000).

their annual compensation.[128] In this case, the damages are even simpler to prove because they consist of actual cash expenses C&J incurred in retaining advisors and compensating its directors on a per-meeting basis. The damages also were foreseeable and are eminently reasonable—amounting to the expenditure of about half a million dollars in the face of an injunction threatening to halt a nearly $3 billion transaction. As such, C&J presumptively is entitled to recover these expenses against the injunction bond.

Plaintiff makes three arguments in an effort to overcome the presumption in favor of C&J recovering damages resulting from the wrongful injunction. Each is without merit.

Plaintiff first argues that C&J failed to mitigate its damages by choosing to lift the stay of the injunction and to conduct the solicitation process during the appeal, rather than to await the outcome of the appeal before beginning the solicitation process. That argument is unavailing. As detailed above, the PI Order provided room to extend the injunction period as needed, including as a result of the stay pending the appeal. Consequently, C&J faced the risk that if it lost the appeal, the injunction would be extended to require it to undertake a full 30-day

---

[128] *Emerald P'rs v. Berlin*, 1998 WL 474195, at \*4 (Del. Ch. Aug. 3, 1998), *aff'd*, 726 A.2d 1215, 1227 ("The record supports the Court of Chancery's determination that the defendants had proved entitlement to $99,200 in damages attributable to the force of the injunction.").

solicitation process that would begin when the appeal process ended. Such a delay would not only result in the potential postponement of a nearly $3 billion transaction by a month, it also would put C&J at risk of losing the Nabors transaction entirely if the injunction were still in place at the end of December.

The merger agreement contained a condition precedent for each party (waivable by the other) requiring that no preliminary injunction prohibiting the merger be in effect when the transaction closed.[129] The agreement further provided that either party could unilaterally extend the December 31 end date in the merger agreement until up to March 31, 2014, but only if the conditions precedent in the merger agreement—including that no preliminary injunction be in place—were satisfied as of December 31.[130] Consequently, if C&J were still laboring under the preliminary injunction at the end of 2014 because the injunction period had been extended or because the solicitation process did not start until the end of the appeal, Nabors would be able to walk away from the transaction.

Plaintiff downplays this risk, asserting that "the record is unambiguous that C&J was aware that there was never any risk that Nabors would terminate the Merger Agreement if the closing occurred after December 31, 2014,"[131] and citing

---

[129] Levy Aff. Ex. 17 § 7.1(e).

[130] *Id.* § 8.1(c).

[131] Pl.'s Br. in Opp'n Mot. Recover Damages Against Inj. Bond 31.

a November 25 public filing of a communication from Petrello to NCPS employees, in which Petrello stated that "Nabors remains fully committed to the proposed transaction."[132] Yet around the same time, Nabors refused Comstock's request to extend the deadline.[133] Although Comstock expressed confidence that Nabors would "extend if/when absolutely needed,"[134] such an informal assurance is a far cry from a binding commitment from Nabors to extend the deadline. Plaintiff's contention that Nabors was committed to the deal thus provides cold comfort in the face of a looming deadline that C&J would be unable to extend without Nabors' consent.

Plaintiff also ignores the fact that the presence of the injunction and the December 31 deadline provided valuable optionality to Nabors at C&J's expense. However committed Nabors may have been to the transaction when the injunction issued, C&J assumed the entire risk of unforeseen circumstances that could cause Nabors to choose to walk away from the deal. "The duty to mitigate is assessed in reference to the exposure of the mitigating party to risk and uncertainty which is, itself, another form of risk."[135] If Nabors refused to preemptively extend the

---

[132] Thomas Aff. Ex. 30.

[133] *Id.* Ex. 7.

[134] *Id.*

[135] *Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *5 (Del. Ch. Jan. 31, 2013).

deadline (which they did refuse to do)[136] and C&J delayed the solicitation process to appeal the injunction, an unexpected change in the attractiveness of the transaction or of C&J's value to Nabors would allow Nabors to scuttle the deal. Paying $542,000 in expenses to undertake the solicitation process in parallel with the appeal to mitigate these real-world risks is a far more reasonable course of action than plaintiff's proposed tactic of mitigating $542,000 in expenses by placing stockholders at even a slight risk of losing the $3 billion Nabors transaction. For these reasons, plaintiff's argument that these relatively modest expenses were unnecessary or easily could have been mitigated lacks merit.[137]

As detailed in the timeline above,[138] the Court put plaintiff on notice that C&J could pursue the solicitation process in tandem with its appeal, that the bond existed to reimburse C&J for such expenses if the injunction turned out to be wrongful, and that C&J could seek to lift the stay in order to begin the solicitation process. Plaintiff thus knew or certainly should have known of the risk that these expenses would be incurred when it elected to post the injunction bond. Having

---

[136] Thomas Aff. Ex. 7 (e-mails from November 26, 2014).

[137] Plaintiff makes a number of claims regarding C&J's knowledge that the transaction would not close by the end of December in any event. These arguments fail because the existence of the preliminary injunction, unlike other obstacles, would prevent C&J from extending the deadline unilaterally.

[138] *See supra* Part I.C.

been granted its request for a preliminary injunction, plaintiff must accept responsibility for the costs that come with it.

Plaintiff's second argument for why it should not bear the costs of the injunction is that C&J did not comply with the PI Order. In particular, plaintiff argues that, because Morgan Stanley and the Special Committee failed to directly compare the value of the Nabors transaction and the Cerberus proposal and committed other analytical mistakes, they did not comply with the PI Order's requirement that the board seek a Superior Proposal as defined in the merger agreement, *i.e.* a proposal that "the [C&J] Board determines in good faith, after consultation with its financial advisors and outside legal counsel, . . . is more favorable to the stockholders of [C&J], from a financial point of view, than the transactions contemplated by this Agreement . . . ."[139] Selectively quoting certain Special Committee meeting minutes, plaintiff argues that the Special Committee did not properly perform this task because it looked only at the "potential value" of the Cerberus bid and the Nabors transaction.

This line of attack is one of semantics that cannot be squared with the full content of these Special Committee minutes, which state:

> The Special Committee asked Morgan Stanley to compare the financial value of the Cerberus proposal to the financial value of the Nabors transaction. Morgan Stanley provided this advice . . . . Page

---

[139] Levy Aff. Ex. 17 § 6.4(e).

15 *shows Morgan Stanley's estimation of potential value* of (i) Keane Group as a standalone entity, (ii) the Company as a standalone entity, (iii) *Keane Group and the Company as a combined entity*, and (iv) *the Company and Nabors as a combined entity*. The materials reflect that the transaction between the Company and Nabors creates more potential value to the Company's stockholders *from a financial point of view than would the Cerberus proposal.*[140]

In other words, contrary to plaintiff's assertions, the minutes strongly suggest that Morgan Stanley and the Special Committee closely examined the financial benefits of both *potential* transactions—each of which has, by definition, a *potential* value.

More generally, plaintiff's attempt to escape its financial responsibilities under the injunction bond by criticizing the methods C&J employed in attempting to comply with the PI Order amounts to impermissible after-the-fact second-guessing. C&J incurred the expenses of hiring financial and legal advisors to assist the Special Committee in soliciting alternative proposals to the Nabors transaction, as plaintiff requested and as the PI Order required. That these costs were incurred in a fashion different from what plaintiff now says it hoped for is of no moment: the bond exists to compensate C&J for its damages, and C&J is therefore entitled to recoup the costs it reasonably incurred as a result of the PI Order.

Finally, plaintiff argues that it would be inequitable to compensate C&J for its damages from the wrongful injunction because C&J acted in bad faith during the solicitation process by engaging in unfair and inequitable conduct. This

---

[140] Thomas Aff. Ex. 26 at 2 (emphasis added).

65

argument seeks to resurrect plaintiff's legally deficient fiduciary duty claim that the solicitation process was a sham designed to protect the Nabors transaction, mislead the board, and prevent alternative bids, thus failing to maximize value for stockholders.[141] As discussed above, these allegations fail to state fiduciary duty claims upon which relief can be granted. The same allegations are insufficient to support a finding of bad faith.

\* \* \* \* \*

For all of these reasons, I find that C&J suffered $542,087.89 in damages as a result of the wrongful injunction that plaintiff requested, and that C&J is entitled to recover these damages against the injunction bond.

## IV. CONCLUSION

For the reasons explained in Section II above, defendants' motion to dismiss the Complaint is GRANTED. The Complaint is hereby dismissed with prejudice. For the reasons explained in Section III above, C&J's motion to recover $542,087.89 in damages against the injunction bond is GRANTED.

**IT IS SO ORDERED**.

---

[141] Pl.'s Br. in Opp'n 36-39.